UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEVIN G. REAMORE,                       Civil Action No. 15-10713

       Plaintiff,

                                      HON. R. STEVEN WHALEN
   v.                                     U.S. Magistrate Judge

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## OPINION AND ORDER

Plaintiff Kevin G. Reamore brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his applications for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have filed summary judgment motions. For the reasons set forth below, Defendant's Motion for Summary Judgment [Dock. #15] is GRANTED and Plaintiff's Motion for Summary Judgment [Dock. #12] is DENIED.

## PROCEDURAL HISTORY

On June 21, 2012, Plaintiff filed an application for DIB, alleging disability as of February 16, 2009 (Tr. 100). After the initial denial of the claim, he requested an administrative hearing, held on August 2, 2013 before Administrative Law Judge ("ALJ")

John Dodson (Tr. 26). Plaintiff, represented by John Bechill, Jr., testified (Tr. 29-39), as did his wife, Katrina Reamore (Tr. 40-52), and Vocational Expert ("VE") Michael Rosko (Tr.53-56). On September 27, 2013, ALJ Dodson found that Plaintiff was not disabled as of the date last insured of June 30, 2009 (Tr. 15-22). On January 26, 2015, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the Commissioner's decision on February 26, 2015.

## BACKGROUND FACTS

Plaintiff, born January 22, 1960, was 53 when the ALJ issued his decision (Tr. 22, 100). He completed one year of college and received training as an "aviation mechanics training licensed airframe and power plant mechanic" (Tr. 123). He worked previously as a Computer Numerical Control ("CNC") operator and as a material handler (Tr. 123-124). His application for benefits alleges disability as a result of "Bipolar 1 disorder mixed in partial remission, depression, weight gain, lack of energy, sleepiness, inability to focus or concentrate, easily distracted, explosive temper outbursts, lack of interest in most activities, [and] feelings of worthlessness" (Tr. 122).

    A.    **Plaintiff's Testimony**

*The ALJ prefaced the testimony by noting that his determination pertained to Plaintiff's condition prior to the June 30, 2009 expiration of DIB benefits* (Tr. 28-29).

Plaintiff offered the following testimony:

His last full-time work was as a CNC operator (Tr. 30). He stopped working in 2003

or 2004 (Tr. 3). He worked as a CNC operator for around 10 years and before that, a material handler (Tr. 30). Before working as a material handler, he worked as a gas station clerk (Tr. 31).

Plaintiff began to experience psychological problems in 2009 (Tr. 31). Dr. George had been his treating psychiatrist since 2009 (Tr. 31). Before 2009, he received therapy through a counseling service (Tr. 32). In 2009, he had a confrontation with a neighbor's teenaged son at which time the neighbor called the police (Tr. 32). Plaintiff had been taking the psychotropic drugs Cymbalta and Abilify since 2009 (Tr. 33). He experienced the medication side effects of sleepiness and a 100-pound weight gain (Tr. 33). Plaintiff slept most of the day and fed himself "occasionally" (Tr. 34). Some days, he wore a robe all day instead of getting dressed (Tr. 34). He lacked the "focus" to read and did not have any hobbies (Tr. 34). He got along with family members by "just coast[ing] by with everyone," but did not talk to his wife's family (Tr. 35). The 2009 confrontation ending with him slapping the teenager (Tr. 36). After the incident, he was disinclined to leave the house (Tr. 36). His wife had to remind him to shower (Tr. 36). His wife did the cooking and housecleaning and his sons did the yard work (Tr. 36). He did not have friends (Tr. 36).

Plaintiff experienced leg swelling after being on his feet for any length of time (Tr. 37). In his job as a CNC operator, he was required to be on his feet "all day" (Tr. 38). In 2009, he weighed around 200 pounds, but now weighed over 300 pounds due to inactivity (Tr. 38).

### B. Testimony by Plaintiff's Wife

Plaintiff's wife, Katrina Reamore, offered the following testimony:

Plaintiff and she had been married for 28 years (Tr. 40). She worked full time as a radiology technologist (Tr. 40). She confirmed her husband's account of the 2009 assault (Tr. 41). In 2009, Plaintiff was diagnosed with depression, "anger management issues," and bipolar disorder (Tr. 41). He began treating with Dr. George in 2009 (Tr. 41). Plaintiff's psychological condition began worsening in February, 2005 when they moved next door to loud and disruptive neighbors (Tr. 42). After Plaintiff slapped the neighbors' teenaged son, the police were called and eventually, Plaintiff was required to go to counseling (Tr. 43). In 2005, Plaintiff had already exhibited signs of bipolarism and had begun receiving mental health treatment in 2005 or 2006 (Tr. 43-44). Plaintiff had gotten worse since 2009 and was often in his pajamas and robe when she came home from work (Tr. 44). After the 2009 legal problems, Plaintiff lost interest in his former hobbies and "vegetate[d]" (Tr. 45). By way of example, Ms. Reamore noted that Plaintiff had refused to assemble a grill on the basis that he was unable to follow directions (Tr. 46). His concentrational problems also began in 2009 (Tr. 46). At present, Ms. Reamore had "to go out in the yard to help him do the yard work or the yard work doesn't get done" (Tr. 47). Following the 2009 incident he "was like a prisoner in the house" (Tr. 47). Plaintiff was no longer welcome at his in-laws' house due to "temper issues" and for the same reason, the in-laws did not come to Plaintiff's house (Tr. 47). Plaintiff's psychological condition had been exacerbated by the incarceration of one of

their adopted children (Tr. 48).

In response to questioning by Plaintiff's attorney, Ms. Reamore stated that before her husband was laid off in 2003, he was frustrated by his coworkers' failure to "take care of the tools" (Tr. 50-51). She testified that her husband used to be "very meticulous" (Tr. 51). She indicated that her husband was never "called back" after the layoff (Tr. 51). At around that time, they decided to adopt two more foster children (Tr. 51). She testified, in effect, that the problems with the new foster children and the problems with the neighbors all contributed to the psychological problems (Tr. 52).

    **C.    Medical Evidence**

### 1. Treating Sources

**1. Records Pertaining to Plaintiff's Condition Before the Expiration of Benefits[1]**

An undated[2] list of Plaintiff's "current medications" as of November 19, 2008 include Cymbalta for "depression and mood" (Tr. 324). Medication records state that Plaintiff was prescribed (or re-prescribed) Cymbalta on January 27, 2009 (Tr. 388). February, 2009 intake records note that Plaintiff was anxious but focused, cooperative, and was able to acknowledge his mental health problems (Tr. 174). Plaintiff reported that he had been a "homemaker" since December, 2003 (Tr. 217). He reported a good relationship with his

---

[1] While Plaintiff's entitlement to DIB benefits ended on June 30, 2009, records created in 2008 through September, 2009 have been considered for possible relevance to his condition prior to the expiration of benefits.

[2] These records were attached to a November, 2012 medication review (Tr. 322-324).

spouse (Tr. 218). He reported pending legal charges for assaulting his neighbors' teenaged son (Tr. 226). He was assigned a GAF of 65[3] and prescribed Cymbalta (Tr. 174, 207, 219, 221). Treating notes from the next month again note that an assault charge had been brought against Plaintiff for the incident with the neighbors (Tr. 177). March, 2009 records note that Susan George, M.D. was the psychiatrist of record (Tr. 233). Treating notes state that Plaintiff's "focus of anger" was individuals driving cars through his subdivision (Tr. 177, 228, 230). He was described as "pleasant" and "cooperative" (Tr. 177). Treating records also note that he was "doing better" and was "able to handle anger" (Tr. 238). Notes from later the same month state that Plaintiff had pled guilty to assault and avoided jail time (Tr. 178, 202). Notes from May, 2009 state that Plaintiff exhibited adequate planing skills with an organized thought process (Tr. 180). He was deemed "fully compliant" with psychiatric and psychological care (Tr. 243). June 17, 2009 records note an intact memory and an organized thought process (Tr. 182, 199). Plaintiff was assigned a GAF of 55[4] (Tr. 182, 199). July 15, 2009 treating records show that Plaintiff was cooperative and initiated interaction with others (Tr. 183, 197). Therapy notes state that he was "doing well" (Tr. 247). September, 2009 records contain similar observations (Tr. 185-186, 195, 252).

---

[3] GAF scores in the range of 61-70 indicate 'some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning.' *American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders--Text Revision*, 34 ("*DSM-IV-TR*") (4th ed. 2000).

[4] A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning., *DSM-IV-TR* at 34.

### 2. Records Created After the Relevant Period

October, 2009 therapy records state that Plaintiff displayed a normal thought content and memory as well as intact judgment (Tr. 187). Therapy notes state that he was "doing well" (Tr. 253, 254). December, 2009 therapy records note depression and fatigue (Tr. 256). January, 2010 therapy records state that Plaintiff displayed an intact memory and normal focus (Tr. 193). In January, 2010, Plaintiff's therapist composed a letter stating that Plaintiff had "successfully completed a course of counseling" and was currently "stable" (Tr. 260). The therapist noted that Plaintiff would require continued medication but would no longer require counseling (Tr. 261-262). A medication review from the next month states that Plaintiff was "doing fair" and denied anger problems or psychosis (Tr. 264). June and August, 2010 reviews state similar findings (Tr. 271, 273). September, 2010 records state that he was "doing better" but had gained weight (Tr. 276).

February, 2011 medication review records state that Plaintiff was "doing fair" and denied anger or agitation (Tr. 284). A September, 2011 medication review notes remark on Plaintiff's recent weight gain and reports of "'dizziness'" (Tr. 297).

February, 2012 records state that Plaintiff, now 300 pounds, planned to go back to work (Tr. 304). Dr. George's February, 2012 records state that Plaintiff's bipolar disorder was in partial remission (Tr. 189). Plaintiff denied psychosis or road rage (Tr. 189). Dr. George noted that Plaintiff was "doing fair," and denied psychosis or road rage (Tr. 306). In May, 2012, Dr. George noted that Plaintiff continued to receive treatment for bipolar

disorder "mixed in partial remission" (Tr. 190, 311). Plaintiff reported that he had begun a factory job, but was fired after a week for being too slow (Tr. 309, 318). He denied psychosis (Tr. 309). An August, 2012 medication review noted that Plaintiff was "doing fair," but lacked "energy and motivation" (Tr. 315, 318, 415, 421). Records state that Plaintiff continued to take Abilify and Cymbalta (Tr. 189).

The following month, Leonard C. Balunas, Ph.D. completed a non-examining review of the treating records on behalf of the SSA, concluding that Plaintiff could not show the onset "severe" impairments prior to June 30, 2009 (Tr. 61-63).

In November, 2012, Dr. George partially completed a medical source statement of Plaintiff's work-related activities (mental), finding that he experienced moderate limitation in making simple work-related decisions, marked limitation in understanding or remembering complex instructions, and extreme limitation in making complex judgments (Tr. 326). She found that Plaintiff could handle his own benefit funds (Tr. 328). The same day, she found that Plaintiff had a long history of emotional problems and lacked energy and motivation (Tr. 329). She assigned him a GAF of 45[5] with a "fair" prognosis (Tr. 329). She found that he was unable to meet competitive standards in completing a normal workday, working without extra rest periods, asking for assistance, getting along with others, responding appropriately to changes, dealing with stress, being aware of hazards, and setting realistic goals (Tr. 330-

---

[5]A GAF score of 41-50 indicates '[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job. *DSM-IV-TR* at 34.

331, 392-393). She found that he was seriously limited in understanding, remembering, and carrying out detailed instructions, performing semiskilled or skilled work, and traveling to unfamiliar places (Tr. 331). She found that Plaintiff experienced "anger, depression, [and] difficulty getting along with people" (Tr. 331). She also noted that Plaintiff had a history of cerebral palsy, back problems, and agitation (Tr. 331-332, 393). She found that he had experienced three episodes of decompensation within a 12-month period with moderate limitation in concentration, persistence, or pace (Tr. 332, 394). She found that he was unable to work because he was "too slow" (Tr. 333, 395). She reiterated that Plaintiff could handle his own benefit funds (Tr. 333).

In January, 2013, Plaintiff reported an improved mood (Tr. 407). In March, 2013, Dr. George noted Plaintiff's denial of psychosis, road rage, irritability, manic symptoms, or depression (Tr. 402). Dr. George's April, 2013 treating records state that Plaintiff denied depression but had difficulty dieting (Tr. 399). She recommended continuing with therapy and seeking the help of a dietician (Tr. 399).

### D. Vocational Expert Testimony

VE Michael Rosko classified Plaintiff's former work as a CNC operator as skilled and exertionally medium (heavy or very heavy as performed) and a material handler as semiskilled and exertionally medium[6] (Tr. 53). The ALJ then described an individual of

---

[6] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or

Plaintiff's age, education and work experience:

> This person [is] capable of light work. Can be no ropes, ladders, or scaffolds, Also there could be no production-like standards such as one might find on an assembly line or conveyor belt. Should be a job involving only occasional superficial contact with the public, and only occasional interaction with coworkers and supervisors. Would such a person be able to perform Mr. Reamore's prior relevant work? (Tr. 54).

The VE replied that given the above limitations, the individual would be unable to perform Plaintiff's past relevant work but could perform the unskilled jobs of mail sorter (1,500 jobs in the metropolitan Detroit area); office cleaner/housekeeper (10,000); and machine tender (5,000) (Tr. 55).

In response to questioning by Plaintiff's attorney, the VE testified that the inability to "complete a normal work day or work week without interruptions due to psychologically based symptoms;" the inability to work at a "consistent pace [without an] unreasonable number of and lengths of rest breaks;" "difficulty asking simple questions or requesting assistance;" "difficulty responding appropriately to criticism from supervisors;" "difficulty with changes in the routine work settings;" "difficulties with normal work stress;" and, the need to miss "more than four days" each month would preclude all work (Tr. 56).

---

carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

### E. The ALJ's Decision

Citing Plaintiff's medical records, ALJ Dodson found that between the alleged onset date of February 16, 2009 and the June 30, 2009 expiration of benefits, Plaintiff experienced the "severe" impairments of "morbid obesity, bipolar I disorder and recurrent symptoms of depression, anxiety and explosive anger" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 17). During the same period, the ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 18). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional limitations:

> [N]o use of ropes, ladders, or scaffolds, no production like standards, only occasional superficial contact with the public and only occasional contact with coworkers or supervisors (Tr. 19).

Citing the VE's job findings, the ALJ determined that while Plaintiff was unable to perform any of his past relevant work, he could work as a mail sorter, office cleaner, or machine tender (Tr. 21-22).

The ALJ discounted Dr. George's opinion that Plaintiff was disabled (Tr. 19). He noted that the psychiatric notes reflected that Plaintiff's moods remained stable with medication (Tr. 20). He noted that the records did not show that Plaintiff required emergency services or medication changes and that his medication continued to be monitored (Tr. 20). He noted that the other evidence did not support the Dr. George's finding that Plaintiff was

unable to perform "a simple work routine in a relatively stress free work environment" (Tr. 20).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### The Treating Physician Analysis

Plaintiff disputes the finding that Dr. George's disability opinion was not entitled to controlling weight.  *Plaintiff's Brief,* 8-15, *Docket #12.*  Plaintiff argues that in performing the treating physician analysis, the ALJ did not consider all the applicable factors listed in 20 C.F.R. 404.1527(c)(2).  *Id.*  at 9-11.  He contends further that the ALJ did not provide "good

reasons" for discounting Dr. George's opinion. *Id.* at 9-15.

Plaintiff is correct that the failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013); *Wilson v. CSS,* 378 F.3d 541, 544 (6th Cir. 2004); § 404.1527(c)(2)). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011). In explaining the reasons for giving less than controlling weight to a treating physician opinion, the ALJ must consider (1) "'the length of the... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency...with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, 378 F.3d at 544–546; § 404.1527(c). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376.

Plaintiff's argument that the ALJ failed to comply with either the procedural or substantive requirements of a treating physician analysis is not well taken. The ALJ acknowledged that Dr. George was a psychiatrist and that she had treated Plaintiff approximately every three months since 2009 (Tr. 19). However, the ALJ found that Dr. George's assessment was inconsistent with her own treating records and the transcript as a

whole. The ALJ noted that the psychiatric treatment notes for the relevant period showed a "stable" mood with medication and treatment (Tr. 20). The ALJ observed that Plaintiff had not required medication changes and had not sought emergency treatment for psychological symptoms (Tr. 20). He noted that Plaintiff's symptoms continued to be controlled with medication and treatment (Tr. 20). He noted that the Dr. George's treatment records did not contradict the finding that Plaintiff could perform "a simple work routine in a relatively stress free work environment" (Tr. 20).

My own review of the treating records supports the ALJ's treating physician analysis. Treating records created the month of the alleged disability onset state that Plaintiff was focused and cooperative (Tr. 174). He was assessed with only mild psychological problems (Tr. 174, 207, 219). While therapy notes from the following month state that Plaintiff felt anger toward drivers in his neighborhood, he was "pleasant" and "cooperative" during his therapy sessions (Tr. 177). Plaintiff reported that therapy and medication helped him "handle his anger" (Tr. 238). While records from May through September, 2009 therapy notes reflect moderate rather than mild psychological symptoms (Tr. 182), the same records note an "intact memory," an "organized thought process," a cooperative attitude, and the willingness to initiate interaction (Tr. 182-183, 185-186, 195, 199, 252). The RFC for unskilled work without production standards with "only occasional superficial contact with the public and only occasional contact with coworkers or supervisors," if anything, overstates Plaintiff's psychological limitations for the period ending on June 30, 2009 (Tr. 19, 54).

For the same reasons, Plaintiff's contention that the ALJ was required to articulate the precise amount of weight accorded Dr. George's opinion (rather than simply stating that it was not entitled controlling weight) does not provide grounds for remand. As reflected in the RFC, the ALJ did not reject Dr. George's findings altogether but gave some weight to her finding of social and concentrational limitation (Tr. 19). Further, it is unclear whether Dr. George's November, 2012 assessment can be interpreted to state that Plaintiff experienced disability prior to the end of June, 2009. While treating notes created after the relevant period suggest that Plaintiff's physical and mental health worsened due to extreme weight gain and lack of motivation, the treating records created prior to the expiration of benefits do not reflect either of those conditions. Because the ALJ's treating physician analysis was well articulated and supported by the record, a remand is not warranted. *See Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir.2004)(In the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings provided that he supplies "good reasons" for doing so).

For these reasons, Defendant's Motion for Summary Judgment [Dock. #15] is GRANTED and Plaintiff's Motion for Summary Judgment [Dock. #12] is DENIED.

Judgment will be entered in favor of Defendant and against Plaintiff.

IT IS SO ORDERED.

                                        s/R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

Date: March 16, 2016

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on March 16, 2016, electronically and/or by U.S. mail.

                                        s/Carolyn M. Ciesla
                                        Case Manager to the
                                        Honorable R. Steven Whalen